## Case No. 6,465.

### HIGBEE v. The NIPOTI ACCAME.

[36 Leg. Int. 294; [1] 14 Phila. 517.]

District Court, E. D. Pennsylvania. June 20, 1879.

COLLISION—SAILING VESSELS—DIRECTION OF WIND.

The bark Nipoti Accame sailing almost directly before the wind collided with the schooner Cordery, which was to leeward, within two points of "close hauled." The court *held* the case to fall within the last clause of the 17th sailing rule prescribed by section 4233, Rev. St., where the language employed is free from ambiguity: "If one of them has the wind aft, the vessel which is to windward shall keep out of the way of the one which is to leeward."

In admiralty.

Curtis Tilton and Henry Flanders, for libellant.

Morton P. Henry, for respondent.

BUTLER, District Judge. On the afternoon of March 3, 1878, the schooner Cordery, loaded with coal, left her anchorage in the Delaware breakwater, (where she had sought harbor a day or two before,) and started on her voyage to Providence, Rhode Island. Very soon the wind died out, and she was becalmed. To avoid drifting with the flood tide, then running up the bay, (near which she still was,) her head was kept to the current. With the ebb, which came at 8 o'clock, she drifted out, heading, as the captain says, east by south, and sometimes east by north; not having wind sufficient for steerage-way. Later in the night, probably between eleven and twelve o'clock, a breeze springing up, her sails were trimmed within a point or two of flat, and she was turned north-northeast. Continuing this course for half an hour or more, and reaching a point midway between the Delaware and New Jersey coasts, the bark Nipoti Accame was discovered, about two lengths off, bearing directly upon her. To avoid the danger of collision, then imminent, her wheel was ported, and the main sheet let run. The next moment, however, she was struck amidships on the port side, and an opening made four to five feet long, and five bends wide, extending to the water's edge. She was then immediately hauled "by the wind," heading north ½ east, in the hope of reaching Cape May beach. Efforts were made to relieve her by means of the pumps, and obstructions to the inward flow of the water; but they proved unavailing, and she sank, five miles off the coast. During the calm referred to, the bark Nipoti Accame had been anchored outside the Delaware Bay, near Cape May shoals, and had been underway, on a southeast by south course, not over ten to twenty minutes, when the collision occurred. In the moment of danger she starboarded her helm, hoping by this means to lessen the force of her blow.

Thus far the facts are not in controversy.

To determine the fault which occasioned the accident, and the consequent responsibility for the loss which ensued, it is necessary to ascertain first, on which vessel rested the obligation to keep out of the other's way; and second, whether she had any proper excuse for the failure to discharge it. To accomplish the first, we must know, in addition to the facts stated, the direction of the wind at the time. The most serious contest in the case was over this important fact. The collision occurred between half past eleven and twelve o'clock, or near that time. Duke, who was on board the schooner, fixes it at twenty minutes to twelve, referring to circumstances which tend to corroborate his statement. Capt. Craviotto, of the bark, says, they got under way about half past eleven, and struck ten minutes later. The testimony of the crews of the two vessels, is in direct conflict respecting the wind, at this time. If there was no other in the case, the question would be difficult to solve; and, with the burden of proof resting on the libellant, the conclusion might be against him. While it is true that the witnesses from the schooner, speaking to this point, outnumber those from the bark; and that Fincatti, from the latter vessel, says the schooner "passed to windward," after the collision,—which cannot be true, if the wind was from the southwest, —and the master of the schooner says, "the wind was coming from the bay" at the time; still without more than the conflicting statements of the respective crews, the question would be involved in serious doubt. Fortunately for the case there is more—other important evidence, to be found in the testimony of disinterested witnesses, of a direct and positive character; as well as in the presumptions arising from established collateral facts bearing on the question.

The parties concur in the statement that the forepart of the night was calm, with occasional fitful puffs of wind, having no settled direction. At nine o'clock the signal service officer at Cape May registered it as south; and at eight minutes past eleven as southwest. This was probably half an hour before the collision. Unfortunately the parties have been unable to procure the subsequent observations or entries of this officer. From the information he has furnished it appears that the wind shifted westward with the slight increase which occurred in its velocity between nine o'clock and eight minutes past eleven. That the velocity continued to increase, and soon after the latter period, very rapidly—reaching twenty miles an hour by fifteen minutes to twelve—is shown by Sergeant Smith, and the record made by the anemometer at Cape May station. The journals at Cape Henlopen and

[1] [Reprinted from 36 Leg. Int. 294, by permission.]

Cape May Life Saving Stations state its direction at 12 o'clock as northwest. The journal of Cape Henlopen lighthouse shows a similar statement, and that of the breakwater lighthouse has it as north. While these entries are not so reliable as those made at the signal service stations, they are nevertheless (and especially by reason of their substantial agreement,) of great importance. Captain Clampit, a pilot, says that on this night he was in his boat between the breakwater and the Over Falls, at half past eleven; that from dark to that time the wind had been uncertain, and without strength; that a strong steady northwest breeze then set in, "coming up pretty fresh at once." Captain Townsend of the schooner Collins, says he was out twelve to fifteen miles east of Cape May, this night, and that when the wind arose it came from the northwest; and so continued throughout the night. While the statements of these two witnesses, Clampit and Townsend, may in some respects be inaccurate, the correctness of the material parts of their testimony, corroborated as it is, I cannot doubt. This direct evidence, furnished by the records of the lighthouses and life saving stations, and the testimony of Captains Clampit and Townsend, finds important corroboration in the presumptions arising from well established collateral facts in the case. During the calm the bark lay at anchor in about five fathoms of water—the tide running down. A large vessel and loaded, her head necessarily turned to the current—pointing northwest, or nearly so. In preparing to move from this position her foretop-sail was braced to starboard, her main top-sail to port, and her jibs were set. So we are informed by the captain. With her sails thus trimmed, as the captain and crew testify, she turned westward, and thus came about to the southeast. This fact forcibly indicates, if it does not prove, that the wind was not southwest. For with such a wind the vessel, so handled, was not likely to describe this movement, if indeed she could do so. She would probably, if not necessarily, have turned off eastward. Such would be the conclusion of a mind inexperienced in the navigation of ships. A reference to the answers of the assessors, accompanying this opinion, will show that these experienced and intelligent seamen express a similar judgment. Again, the schooner's proper course, with a southwest or western wind, was east northeast. With a northwest wind, such as the libellant's witnesses describe, it was northward, almost as nearly as practicable, to the New Jersey coast; which, when reached, would be followed eastward. In the unsteady wind at starting, she veered back and forth from east by south, to east northeast, endeavoring to pursue the latter direction. Soon after her sails were shifted, and her head turned north northeast. This change is not only consistent with the hypothesis that the wind

shifted to the northwest, but cannot well be accounted for on any other. (Whether with such a wind her boom would shift, as was suggested, depends upon the extent to which they were over to port, and other circumstances tending to disturb or keep them in place.)

It would be unprofitable to pursue the subject further. Sufficient has been said, I hope, to justify the conclusion that the wind, at the time of collision, was northwest.

The course of the schooner, as before stated, was north northeast, and that of the bark southeast by south. Both, therefore, had "the wind free," the former by about two points, and the latter by about nine. The bark, however, had the "wind aft," and was, therefore, by the last clause of the 17th sailing rule—prescribed by section 4233 of the Revised Statutes—obliged to keep out of the schooner's way. I see no difficulty in construing the rule as respects the facts of this case, or indeed anything open to construction. The language employed is free from ambiguity—"if one of them has the wind aft, the vessel which is to windward shall keep out of the way of the one which is to leeward." Here the bark had the "wind aft," sailing almost directly before it, while the schooner was to leeward, within two points of "close hauled." The former could change her course with facility and without disadvantage, while the latter could not. By the spirit as well as by the terms of the rule, therefore, the obligation was on the bark to give way, and allow the other (as was her duty) to hold her course. As may be seen by reference to the answers of the assessors, this, too, is their understanding of the rule and the practice under it. Such being the obligation of the bark, has she any excuse for the failure to discharge it? The only one suggested is that the schooner was without proper lights. If this were true, it would be ample; she was not required to avoid a vessel which she could not see. But I do not think it is true. The burden of proof here is on the respondent, while, as I think, the clear weight of the evidence is against him. Witnesses on board the schooner testify to putting the lights up; others to seeing them up, and the lookout on board the bark to seeing one of them just before the collision. This latter witness did not see them earlier; and it is argued, therefore, that they were then first exhibited, or had gone out, or grown dim from want of care. This does not seem probable—much less probable, in view of all the testimony, than that the lookout was wanting in vigilance. In the labor and confusion of getting underway, it is not unlikely that he was interfered with, or his attention diverted, until the moment when he saw the light, then too late to avoid the catastrophe. The facts thus found dispose of the case. Whether the schooner maintained a vigilant outlook, and whether the bark had proper lights up—in view of the

direction of the wind, and the consequent relative obligations of the vessels—is unimportant. The schooner, by holding her course, with her lights up, discharged her whole duty, and the bark must answer for the consequences of failing to keep off. As is said by Mr. Justice Strong, in The Fannie, 11 Wall. [78 U. S.] 243, "It is not worth while to discuss the question whether the lookout on the schooner was sufficient. If it was not, it can make no difference, for the want of a proper lookout did not contribute to the disaster. If the schooner held her course it was all the other vessel had a right to require, and whether she had a proper lookout or not, it was her duty to do precisely what she did." In view, however, of the possibility of further proceedings, I deem it proper to say that a careful examination of the evidence has satisfied me that the schooner maintained a sufficient lookout.

NOTE. Since the foregoing was written my attention has been called to the case of The Spring, 1 L. R. Adm. & Ecc. 99, in which the English sailing rule 12 (prescribed by St. 25 & 26 Vict.), in terms identical with our rule 17, as respects the parts there and here involved, was applied. The wind was S. S. E. The Spring was moving W. by S., and the Constantine N. N. E. Notwithstanding that the Spring was on the port tack, and the Constantine had not the wind directly "aft," (much less so than had the Nipoti Accame,) the court held her to be within the rule, and therefore responsible for failure to keep out of the Constantine's way. It is important to observe that in this case the Constantine had the wind almost, if not quite, on her starboard quarter.